FRANK M. JOHNSON, Jr., Circuit Judge:
Fred E. Bartlett, Jr., an attorney, appeals from his conviction in the Middle District of Georgia for violations of 18 U.S.C. §§ 152 and 371 (1976) (amended 1978). Bartlett was initially indicted with four other defendants; one co-defendant’s trial was severed while the other co-defendants pleaded guilty and two of them testified against Bartlett. Count One of the indictment *1186 charged Bartlett with conspiracy to knowingly and fraudulently conceal property with intent to defeat the bankruptcy law and with making a false oath or account in or in relation to a bankruptcy proceeding in violation of 18 U.S.C. § 371. Count Two charged him with knowingly and fraudulently transferring and concealing property with intent to defeat the bankruptcy law in violation of 18 U.S.C. § 152. Count Four charged Bartlett with making a false oath during a bankruptcy hearing.[1] The jury found Bartlett guilty on each count as charged and he received a two-year sentence on each count to run concurrently.
In 1974, attorney Bartlett was hired by Robert L. Herring to provide Herring and his brothers with legal services on various corporate matters. Herring revived a dormant closely held family business, Herring Feed & Grain [H.F. & G.], and asked Bartlett to form Herco as a wholly owned subsidiary of H.F. & G. that would purchase and sell heavy earth moving equipment. Apparently Bartlett also helped form three other closely held corporations-Superior Equipment, Herco Transportation & Leasing [Herco T & L] and Southern Ventures, LTD. [SVL]-which existed primarily to receive and dispose of Herco’s assets.[2]
Although Herco was a subsidiary of H.F. & G., it was clearly doing more business than H.F. & G. and in 1975 Bartlett suggested to Herring that H.F. & G. be dissolved.[3] Eventually Herco experienced financial difficulties and filed a voluntary petition for bankruptcy in April 1978. Her-co’s difficulties were caused partly by Herring’s actions: he used Herco as a bulldozer dealer to procure financing (over $1,200,000 from five financial institutions) for sales of nonexistent bulldozers. Consequently Herring, whose case was severed from the instant case, was convicted of racketeering in United States v. Herring, 602 F.2d 1220 (5th Cir. 1979), cert. denied, 444 U.S. 1046, 100 S.Ct. 734, 62 L.Ed.2d 732. Another source of Herco’s problems was that by the time its petition was filed it had no viable assets.[4]
The issues at trial focused on Bartlett’s knowledge of various corporate transactions and his voluntary statements made at Her-co’s bankruptcy hearing. Bartlett prepared the bankruptcy petition which made no mention of SVL even though Bartlett held a warranty deed from Herco to SVL that purportedly transferred a 273 acre farm to SVL; he also knew about two other land transactions between Herco and SVL.[5] Moreover, all of Herco’s corporate minutes were signed at one meeting; as secretary to the directors, Bartlett was the one responsible for “updating” those minutes.[6] Finally, *1187 Bartlett was charged with making a false oath when he denied under oath that he knew who the principals of SVL were.[7]
On appeal, Bartlett’s primary contention is that the trial court’s actions during trial deprived him of his right to a fair and impartial trial as guaranteed by the Fifth and Sixth Amendments to the United States Constitution. His second major contention is that the trial court made certain errors in its charge to the jury. We have examined each of the points raised on appeal and we find no reversible error. Accordingly, we affirm.
*1188 Bartlett asserts that the judge’s intervention during the trial prejudiced his right to a fair and impartial trial. After Bartlett had been examined by his own counsel and the prosecutor for a total of I2V2 hours (over a two day period), the court immediately began its own examination that exceeded an hour. Bartlett contends that during this cross-examination the court overstepped the bounds of impartial judicial inquiry and became a “surrogate prosecutor.” Moreover he cites various exchanges between the court and counsel as evidence of the court’s bias against the defendant.
We have examined the record as a whole and conclude that Bartlett received a fair trial. Moore v. United States, 598 F.2d 439, 443 (5th Cir. 1979). Following our common law heritage, a judge is not a mere moderator, and he has an obligation and duty to question witnesses and comment on the evidence when necessary. Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321 (1933); United States v. Jacquillon, 469 F.2d 380, 387 (5th Cir. 1972). In fact a trial judge may elicit facts not yet adduced or clarify those previously presented and he may maintain the pace of the trial by interrupting and curtailing counsel’s examinations as a matter of discretion. Moore v. United States, supra, 598 F.2d at 442; United States v. Hill, 496 F.2d 201, 202 (5th Cir. 1974); Kyle v. United States, 402 F.2d 443, 444 (5th Cir. 1968).
Only when the judge’s conduct strays from neutrality is a defendant thereby denied a fair trial as required by the Constitution. See United States v. Middlebrooks, 618 F.2d 273, 277 (5th Cir. 1980); United States v. Daniels, 572 F.2d 535, 541 (5th Cir. 1978). That was not the case here as we find the trial judge’s cross-examination was a sincere attempt to clarify Bartlett’s most equivocal testimony. United States v. Middlebrooks, supra, 618 F.2d at 277. On the whole, the court’s questions attempted to illuminate Bartlett’s intent, which we view as a material issue in a prosecution for concealing assets. Cf. United States v. Evans, 574 F.2d 1287, 1288 (5th Cir. 1978), cert. denied, 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458; Accord: United States v. Guglielmini, 384 F.2d 602, 606 (2d Cir. 1967), cert. denied, 400 U.S. 820, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970).
Moreover, our review of the record failed to show that the trial judge improperly commented on the credibility of any of the witnesses.[8] United States v. Freeman, 619 F.2d 1112, 1122 (5th Cir. 1980). The court acted well within its discretion when it requested Bartlett to refer to the Georgia Code to enable him to provide more informative answers to the court’s questions. United States v. Vida, 370 F.2d 759, 768 (6th Cir. 1966), cert. denied, 387 U.S. 910, 87 S.Ct. 1695, 18 L.Ed.2d 630. Finally, we find that the trial judge was aware of the sensitive role he plays in the eyes of the jury and that his cautionary instructions that the jury was not to draw any improper inferences from his interventions were adequate. United States v. Middlebrooks, supra, 618 F.2d at 277. While we agree that the record reflects some tension between the court and defense counsel, we find that the incidents cited fail to disclose any conduct on the part of the trial judge that gives rise to a constitutional violation. United States v. Abrams, 568 F.2d 411 (5th Cir. 1978), cert. denied, 437 U.S. 903, 98 S.Ct. 3089, 57 L.Ed.2d 1133.
Bartlett’s next contention on appeal concerns the court’s charge to the jury. He argues that the court erred in allowing the false oath count (Count Four) to go to the jury because the questions asked of him were ambiguous and because the evidence was *1189 insufficient to support a conviction on this count. Further, he contends that the court improperly converted a question of law regarding the dissolution of H.F. & G. into one of fact for the jury consideration. Finally he alleges several errors in the court’s general charge on Count Four and in its specific charge on the definition of the word “principals.”
It is axiomatic in this Circuit that the jury charge as a whole must be examined to see if the jury was misled and whether the defendant was thus prejudiced. See, e. g., Mid—Texas Communications Systems, Inc. v. American Tel. and Tel. Co., 615 F.2d 1372, 1390 (5th Cir. 1980); Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076, 1100 (5th Cir. 1973). We have examined the charge as a whole and find no prejudice to the defendant and, therefore, no error. The court properly instructed the jury on the Government’s burden of proof on the false oath count and the other counts as well. See, e. g., United States v. Jessee, 605 F.2d 430, 431 (9th Cir. 1979); cf. United States v. Whitaker, 619 F.2d 1142, 1149 (5th Cir. 1980); United States v. Kehoe, 562 F.2d 65, 69 (1st Cir. 1977).
We find that the evidence in to to was more than sufficient to support a conviction on each of the counts charged. United States v. Haymes, 610 F.2d 309, 311-12 (5th Cir. 1980).[9] We find that the remainder of Bartlett’s claims of error are without merit; consequently we
AFFIRM.

. Bartlett was not charged in Count 3 of the indictment.

. The Government alleged that each of these corporations-Superior Equipment, Herco T & L, and SVL-was a dummy corporation. The record reflects that these corporations did not have any paid-in capital, that their corporate accounts were all drawn on checks issued by Herco, that many of their corporate papers and transactions were improperly recorded, and that each corporation (except SVL) had virtually identical officers and directors.

. It is disputed whether H.F. & G. was dissolved (the Secretary of State issued dissolution papers) or consolidated with Herco (since H.F. & G.’s stockholders were virtually identical to Herco’s stockholders). It is undisputed that Herco’s voluntary bankruptcy petition listed H.F. & G.’s property as an asset and that H.F. & G.’s assets were not distributed to its stockholders as required by Ga.Code Ann. § 22-1312 (1977).

. Its bulldozers had been repossessed by finance companies and all of its other assets had been either sold or transferred to one of the dummy corporations.

. Bartlett was directly involved in forming SVL. He traveled to Nassau at Herring’s direction for the purpose of contacting a Bahamian law firm, Higgs & Johnson, that would actually do the incorporation. The record contains several letters between Bartlett and Higgs & Johnson and evidence of at least two meetings between him and the law firm. In fact, it was Bartlett who thought up the name, Southern Ventures.

. One witness testified that the purpose of this meeting was not simply to formalize roughly-drafted minutes but rather was for the purpose of preparing for Herco’s imminent bankruptcy. The minutes were all signed approximately one month before the petition was filed.

. On June 1, 1978, Bartlett gave the following testimony during a bankruptcy proceeding:
“Q Today, there were some questions concerning the transactions with Southern Ventures, Limited. Could you describe those transactions from the inception as you recall the transactions?
A Mr. Raney, I did the following work on those things: I drew up the deeds to the property in Worth County, had them executed and filed. I drew up mortgages for property here in Dougherty County and had them executed, tangible tax, and filed. I later drew up a deed from Herco Corporation to Southern Venture, Limited, and had it executed by officers of the corporation and filed.
Q In connection with those, could you give us the “substance of the transactions”?
A Well, there wasn’t no-What do you mean, “Substance of the transactions”?
Q Well, why were they entered into? Well, first of all. You are talking about deeds and mortgages. Can we take each parcel or group of parcels and discuss-
A Well, basically, all I know about the transaction is this: That R. L. stated that they had bought some equipment from a company, Southern Ventures, Limited. Three hundred and fifty-six thousand dollars. They had agreed to transfer the property in Worth County for fifty-six thousand dollars and he wanted deeds drawn up for that amount. That was the downpayment on the equipment. That they were going to give them a mortgage on other property for three hundred thousand. I think they executed some notes at first for three hundred thousand. I’m not sure that they even gave a mortgage at that time.
Q Now you were saying that first fifty-six thousand was-the total transactions was for three hundred and fifty-six thousand?
A That’s the way I understood it.
Q To purchase certain equipment?
A That’s right.
Q And that equipment was being purchased from Southern Ventures, Limited?
A Right.
Q Was that pursuant to a contract of sale, or how did you know the firm was involved in a sale?
A The only knowledge I have of that is what Mr. Herring told me.
Q Did you confer with the other side in drawing those documents up?
A No, sir, I did not.
Q You had no conversations anyone?
A No, sir.
Q You just drew up the deeds?
A Yes.
Q Pursuant to the instructions of R. L. Herring?
A Yes, sir.
Q Did you ever go to the Bahamas to discuss the transactions?
A I went to the Bahamas, but I didn’t discuss the transaction.
Q You never met anybody from Southern Ventures, Limited?
A No, sir.
Q Do you know the principals of that corporation? Who they are?
A No, sir.”
Record, Vol. 5, at 542-544.
The following is a portion of Bartlett’s testimony on March 28, 1979, before the grand jury:
Q “Now what I want to know, you didn’t know Southern Venture was incorporated until sometime after the 25th of March. So how in the world could Southern Venture be selling equipment to Herco Corporation on March 15th?”
A “Mr. Wilson, I know that Southern Venture had a corporate charter. But I also knew that it had no officers or directors. I did know that the only person having any beneficial interest that I knew of was Robert Herring. He was the person who directed Southern Venture. He did now [sic] qualify as an officer or director but he was the alter ego of it. There was no question about that. He could deal for them.”
Q “Even back in March of 1977?”
A “Yes sir. He was the beneficial owner of it. See, many of these corporations down there even though they’ve got these capital, they have nothing but nominee shareholders and that’s the way I understand the purpose of that, it is just for that purpose.”
Q “What purpose?”
A “That they don’t want anyone to know who owns the corporation.”
Q “Now the question I asked you, you didn’t know until March 25th, 1977 or after that the company was in fact incorporated?”
A “I knew in January of 1977 who the beneficial director of that company was. It was Robert Herring. He was the one that set it up. He was the only person who could act for it at that time.”
Record, Vol. 13 at 1335-37.

. During oral argument before our panel, Bartlett strongly argued that the court’s sua sponte instruction to the jury explaining the co-defendants’ plea agreement effectively vouched for the credibility of those witnesses since the court emphasized that it was not bound by the plea agreement and that each of them faced a possible five year sentence. We find the court’s instruction was proper and it was more favorable than not to the defense. See United States v. Rosson, 441 F.2d 242, 244 (5th Cir. 1971). In fact the court did not follow the recommendation for a six month sentence; the co-defendants who testified for the Government were each sentenced to eighteen months, just six months less than Bartlett.

. Bartlett focuses his argument as to Count Four on the ambiguity of the word “principals” and the evidence relating thereto. He spent a great deal of time during trial and on this appeal arguing that he thought “principals” meant officers and directors of SVL and that he did not actually know the names of the nominee officers and directors at the time of the Herco bankruptcy hearing. In view of Bartlett’s later grand jury testimony, the jury was certainly entitled to reject Bartlett’s interpretation of the meaning of “principals.” United States v. Dioguardi, 428 F.2d 1033, 1036 (2d Cir. 1970), cert. denied, 400 U.S. 825, 91 S.Ct. 50, 27 L.Ed.2d 54.